**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS

OCT 1 2 2016

JAMES W. McCORMACK, CLERK
By:_____
　　　　　　　　　　　DEP CLERK

DOWNWIND, LLC and GOLDEN BRIDGE, LLC, )
　　　　　　　　　　　　　　　　　　　　)
　　　　　　Plaintiffs,　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　)
　　　　v.　　　　　　　　　　　　　　　　)　　　Civil Action No. 3:16-cv-207-DPM
　　　　　　　　　　　　　　　　　　　　)
UNITED STATES DEPARTMENT OF ENERGY; )
ERNEST MONIZ, in his official capacity as　　)
Secretary of the United States Department of　)
Energy; SOUTHWESTERN POWER　　　　)
ADMINISTRATION; SCOTT CARPENTER,　)
in his official capacity as Administrator of the　)
Southwestern Power Administration,　　　　)
　　　　　　　　　　　　　　　　　　　　)
　　　　　　Defendants.　　　　　　　　　)
_____)

## PLAINS AND EASTERN CLEAN LINE HOLDINGS LLC'S BRIEF
## IN SUPPORT OF MOTION TO INTERVENE

Plains and Eastern Clean Line Holdings LLC moves pursuant to Rule 24(a) and (b) of the

Federal Rules of Civil Procedure to intervene in this action. Plains and Eastern Clean Line

Holdings LLC is a wholly owned subsidiary of Clean Line Energy Partners LLC.  Clean Line

Energy Partners LLC and its affiliates are developing several electric-transmission infrastructure

projects to deliver thousands of megawatts of low-cost renewable power from the windiest areas

of the United States to areas that need clean, reliable energy.  In 2009 Clean Line began

development of the Plains & Eastern Clean Line (the "Project"), a transmission line that will

connect the abundant wind resource of the Oklahoma Panhandle region with utilities in

Arkansas, the Mid-South, and the Southeast.[1]  The Project will be capable of delivering enough

---

[1] "Clean Line" refers to Plains and Eastern Clean Line Holdings LLC and its affiliates that are developing the
Project.

electricity to serve over a million homes throughout the broader region.  *See* Decl. of Mario Hurtado, ¶ 4 (attached to Motion as Ex. A) ("Hurtado Decl.").  The delivery converter station to be located near Russellville, Arkansas, will have the capability to inject enough energy to serve over 160,000 homes.  *Id*.

Recognizing the need for new transmission infrastructure, Congress authorized the United States Department of Energy ("DOE") through Section 1222 of the Energy Policy Act of 2005 to enter into public/private partnerships to develop new transmission infrastructure.  42 U.S.C. § 16421.  In issuing its June 2010 Request for Proposals ("RFP") for potential projects under Section 1222, DOE presented a natural opportunity to combine Clean Line's vision of improving access to renewable energy resources with the federal interest in strengthening the electric transmission grid.  After several years of government review and evaluation, DOE issued a Secretarial Determination approving DOE's participation in the Project on March 25, 2016, and explained its reasons for doing so in the Record of Decision and Summary of Findings released on the same date.  *See generally* Compl., Ex. B (Doc. No. 1-3); Ex. A (Doc. 1-2); Ex. C (Doc. No. 1-4).  Concurrently, Clean Line and DOE entered into a Participation Agreement (the "Participation Agreement"), which governs the roles and responsibilities of Clean Line and DOE with respect to implementing key aspects the Project.  *See generally* Compl., Ex. D (Doc. No. 1-5).  Through this agreement, Clean Line and DOE will complete a transmission line project that will enable the construction of thousands of megawatts of new renewable energy projects that would not otherwise be built due to the limitations of the existing grid.  The Project will enhance the reliability of the electric system through the use of high-voltage direct-current technology, create jobs to build and operate new infrastructure, and improve the environment by displacing older, higher emitting fossil fuel generation.  *See* Hurtado Decl. ¶ 3.

Clean Line has already invested more than $80 million dollars in the Project. Since the Secretarial Determination, Clean Line has initiated negotiations for the voluntary acquisition of right-of-way easements with hundreds of landowners. Further, Clean Line employees and representatives have completed environmental surveys on more than 1,400 parcels of land. Clean Line is financially and commercially responsible for undertaking these and many other activities under the Participation Agreement. Moreover, in order to meet the 2020 in-service date for the Project, time-sensitive construction-related activities and equipment orders must be initiated by no later than mid-2017.

Plaintiffs Downwind, LLC and Golden Bridge, LLC challenge the development and implementation of this Project under Section 1222. They purport to represent landholders in Arkansas, some of whom may own land near or along the proposed route for the Project. Plaintiffs seek to invalidate the Secretarial Determination and DOE's execution of the Participation Agreement with Clean Line. The Project cannot move forward without Clean Line and DOE meeting their obligations under the Participation Agreement. Clean Line is entitled to intervene in this lawsuit to protect and defend its interests in the development and implementation of the Project, as well as its rights and obligations under the Participation Agreement.

## PROCEDURAL AND FACTUAL BACKGROUND

On June 10, 2010, DOE issued an RFP under Section 1222 seeking proposals for projects in which DOE could participate in a variety of ways including the design, development, construction, operation, maintenance, or ownership of upgraded or new transmission facilities. *See* Request for Proposals for New or Upgraded Transmission Line Projects Under Section 1222 of the Energy Policy Act of 2005, 75 Fed. Reg. 32,940 (June 10, 2010). Clean Line responded to this RFP by proposing to work with DOE and Southwestern Power Administration on the

3

Project, which would promote electric reliability, meet the needs of generators and utilities for new transmission capacity, and enable the construction of thousands of megawatts of new, cost-effective renewable electric generation capacity.

DOE concluded in April 2012 that it had sufficient information to initiate federal environmental reviews for the Project under the National Environmental Policy Act ("NEPA"), National Historic Preservation Act ("NHPA") and Endangered Species Act ("ESA"). DOE's review included public scoping meetings; federal, state and tribal outreach and meetings; public hearings; and several opportunities for the public to review and comment on the Project, including the proposed transmission line route and alternative routes.[2] Clean Line also held its own public workshops, meetings, and other outreach activities regarding the proposed route of the Project. *See* Hurtado Decl. ¶ 9(h). Following completion of these reviews and consideration of public comments addressing the Project's evaluation under Section 1222, the Secretary of Energy approved participation by DOE in the Project in the Secretarial Determination published March 25, 2016 (Compl., Ex. B (Doc. No. 1-3)), which was supported by the Record of Decision (Compl., Ex. A (Doc. No. 1-2)) and Summary of Findings (Compl., Ex. C (Doc. No. 1-4)), both of which were issued concurrently with the executed Participation Agreement (Compl., Ex. D (Doc. No. 1-5)).

---

[2] DOE held three separate comment periods regarding the Project: one following issuance of the Notice of Intent to prepare an environmental impact statement pursuant to NEPA, issued December 21, 2012, which sought comments regarding the Project and the scope of the proposed environmental review (*see* Notice of Intent to Prepare an Environmental Impact Statement for the Plains & Eastern Clean Line Transmission Project and Notice of Potential Floodplain and Wetland Involvement, 77 Fed. Reg. 75,623 (Dec. 21, 2012)); a second following issuance of the Draft Environmental Impact ("DEIS") on December 17, 2014, which sought comments regarding the environmental review regarding the Project, including the proposed route for the transmission line and regarding the consideration of historic properties and cultural resources under the NHPA (*see* Plains & Eastern Clean Line Transmission Project Draft Environmental Impact Statement, 79 Fed. Reg. 75,132 (Dec. 17, 2014), as amended 79 Fed. Reg. 78,079 (Dec. 29, 2014) and extended 80 Fed. Reg. 7,850 (Feb. 12, 2015)); and a third beginning on April 28, 2015, which sought comments on Clean Line's RFP application and supporting information under Section 1222. *See* Application for Proposed Project for Clean Line Plains & Eastern Transmission Line, 80 Fed. Reg. 23,520 (Apr. 28, 2015) and extended 80 Fed. Reg. 34,626 (June 17, 2015).

The Participation Agreement places different obligations on Clean Line and DOE with respect to the Project. Clean Line will own the Project facilities in Oklahoma, and DOE will own the Project facilities in Arkansas. Compl., Ex. D ¶ 2.2, at 45 (EXH. D 000052). Clean Line alone is responsible for paying all fees and expenses of Project contracts. *Id.* ¶ 4.4(b), at 54 (EXH. D 000061). DOE and Clean Line have agreed to specific requirements for the acquisition of rights-of-way in Arkansas and Oklahoma that govern both Clean Line's efforts to acquire rights-of-way on a voluntary basis, and DOE's acquisition of rights-of-way through voluntary acquisition or, as a last resort, through its exercise of its eminent domain authority. *Id.* ¶¶ 3.2 & 3.3, at 47-50 (EXH. D 000054-57).

Clean Line has undertaken and completed a variety of steps necessary to build the approximately $2.5 billion Project. *See* Hurtado Decl. ¶¶ 4, 9. Several interconnection studies have been completed with the relevant electric grid operators that show the Project can be reliably interconnected to the existing transmission grid. *Id.* ¶ 9(e). Clean Line executed an Interconnection Agreement with the Southwest Power Pool (the grid operator at the Project's western end in Oklahoma) and Southwestern Public Service Company (the utility to which the Project will interconnect). *Id.* ¶ 9(f). The Project received negotiated rate authority from the Federal Energy Regulatory Commission, and Clean Line is in advanced negotiations with customers seeking long-term contracts for transmitting energy over the transmission line. *Id.* ¶ 9(b). In addition, Clean Line has reached an agreement with Sediver, a company building a facility in West Memphis, Arkansas, to supply high-voltage electrical insulators and other materials to the Project. *Id.* ¶ 9(g).

Several dozen Clean Line employees and representatives are currently in the field acquiring rights-of-way by voluntary agreement with property owners. *Id.* ¶ 9(a). Dozens of other Clean Line employees and representatives are conducting surveys, studies, and other

5

environmental reviews. *Id.* As of the date of this filing, Clean Line has completed surveys on more than 1,400 parcels. *Id.* ¶ 9(c). Further, Clean Line is complying with DOE's Mitigation Action Plan, as required by the Record of Decision, by implementing relevant environmental protection measures during the design phase of the Project and by developing the required environmental management protocols. *Id.* ¶ 11. All told, Clean Line has already invested over $80 million dollars in the Project, *id.* ¶¶ 9, 12, 13, all funded with no risk to the taxpayers because DOE has no responsibility under the Participation Agreement for these costs. Compl., Ex. D ¶ 4.4(b), at 54 (EXH. D 000061).

The Project is scheduled to be placed in service in 2020. *See* Hurtado Decl. ¶ 14. This can only occur if major construction activities begin in 2017. *Id.* In fact, Clean Line must place orders and make additional, substantial binding commitments for components and services by mid-2017. *Id.* A wide variety of entities will rely upon or benefit from the Project reaching its scheduled in-service date of 2020. *Id.* ¶ 16. Grid operators must undertake extensive efforts to integrate the Project into the transmission grid based on the year the Project is placed in service. *Id.* Landowners will receive additional payments under the easement agreements when construction commences. *Id.* Utilities must plan for a specific in-service date to supply their customers with low-cost clean energy provided by the transmission line. *Id.* Advancing key construction activities in 2017 and therefore reaching a 2020 in-service state requires this Complaint be resolved in an efficient manner.

## ARGUMENT

This Court should grant Clean Line's motion to intervene because this lawsuit seeks to invalidate DOE's decision to participate in the Plains & Eastern Clean Line and thereby to stop the Project from moving forward. As the RFP respondent and now as a party to the Participation Agreement, Clean Line has a direct and independent interest in this lawsuit that cannot be

adequately represented by DOE.  In the interest of fairness and efficiency, Clean Line is entitled to intervene and defend its specific, parochial interests in the Project and the Participation Agreement.

## I.      CLEAN LINE HAS A RIGHT TO INTEVENE UNDER RULE 24(a)(2)

Clean Line is entitled to intervene, as-of-right, under Rule 24(a)(2) of the Federal Rules of Civil Procedure.  Rule 24(a)(2) provides that the court must permit anyone to intervene who:

> claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest.

Courts applying this Rule have broken it into four elements:  (1) the motion is timely; (2) the movant has a recognized interest in the subject matter of the litigation; (3) the interest might be impaired by the disposition of the case; and (4) the interest will not be adequately protected by the existing parties.  *See S. Dakota ex rel. Barnett v. U.S. Dept. of Interior*, 317 F.3d 783, 785 (8th Cir. 2003).  Further, the Court must apply Rule 24 liberally and practically, and "with all 'doubts resolved in favor of the proposed intervenor.'"  *Nat'l Parks Conservation Ass'n v. EPA*, 759 F.3d 969, 975 (8th Cir. 2014) (quoting *Turn Key Gaming, Inc. v. Oglala Sioux Tribe*, 164 F.3d 1080, 1081 (8th Cir. 1999)); *see United States v. Union Elec. Co*., 64 F.3d 1152, 1158 (8th Cir. 1995).

### A.      Clean Line's Motion Is Timely

Clean Line's motion to intervene is timely.  "Whether a motion to intervene is timely is determined by considering all the circumstances of the case."  *Mille Lacs Band of Chippewa Indians v. Minnesota*, 989 F.2d 994, 998 (8th Cir. 1993).  Three key considerations pertinent to timeliness are whether there was delay in seeking intervention, how far the litigation has

progressed, and whether such a delay might prejudice other parties to the litigation. *Union Elec. Co.*, 64 F.3d. at 1159.

Plaintiffs filed this lawsuit on August 15, 2016. The Defendants have not yet filed a response. No schedules have been set by the Court. The Administrative Record has not been filed. Clean Line's motion to intervene has not been delayed and no material proceedings in this case have occurred. That alone resolves any question of timeliness because a motion is considered timely when it is filed before the pleadings have closed. *See* 7 C. Wright & A. Miller, Federal Practice & Procedure § 1916 (2007) ("an application made before the existing parties have joined issue in the pleadings has been regarded as clearly timely"). No party can complain that Clean Line's appearance this early in the lawsuit prejudices anyone in any way. Rule 24(a)'s timeliness requirement is therefore satisfied.

**B.    Clean Line Has an Interest in the Subject Matter of This Litigation**

A person seeking to intervene under Rule 24(a)(2) must have an interest in the subject matter of the litigation; that is, an interest that is direct, as opposed to tangential or collateral. *Union Elec. Co.*, 64 F.3d at 1161. Clean Line has substantial and protectable interests at stake in this litigation.

**1.    Clean Line Has an Independent Legal Interest in DOE's Review Under Section 1222 and the Resulting Participation Agreement.**

Clean Line has a direct interest in this lawsuit that is entitled to legal protection. Clean Line was a respondent to DOE's RFP and DOE scrutinized Clean Line's application under Section 1222 before deciding to participate in the Project. As the successful RFP respondent, and having invested significant resources in supporting its proposal through both the Section 1222 review and associated NEPA, NHPA and ESA reviews, Clean Line has an independent interest in the appropriate evaluation of the Project under Section 1222 and the RFP, as well as

DOE's subsequent determination to participate in the Project. The courts have repeatedly allowed successful RFP applicants to defend those decisions, and this Court should allow Clean Line to do so as well.[3]

Furthermore, Clean Line has a legally protected interest in its Participation Agreement with DOE, which resulted from the RFP process and establishes legally protected rights and obligations inuring, separately, to Clean Line and DOE for implementation of the Project.[4] Plaintiffs seek to invalidate this Participation Agreement in their lawsuit. *See, e.g.*, Compl., Prayer for Relief ¶¶ 1-3, 6, 7. A contract right is a legally protectable interest. *ABF Freight Sys., Inc. v. Int'l Bhd. of Teamsters*, 645 F.3d 954, 959 (8th Cir. 2011).[5] Although *ABF Freight Systems* focused on standing, its acknowledgment that contract rights are legally protectable is clear. *Id.* Other courts, when looking at contractual agreements with the government for purposes of intervention, have held that the contractual rights arising from those agreements are legally protectable and support intervention. *E.g., Utahns for Better Transp. v. U.S. Dept. of Transp.*, 295 F.3d 1111, 1116 (10th Cir. 2002) (holding that the intervenor had the requisite interest because its members had existing contracts with the Department of Transportation under the approved bids for the transportation plans, and such members would suffer economic injury if the plans were vacated); *Kleissler v. U.S. Forest Serv.*, 157 F.3d 964, 972-73 (3d Cir. 1998) (noting that companies with contracts to harvest timber on federal land had properly been granted intervention in a suit challenging the government's approval of the tree cutting); *Sierra*

---

[3] In many cases involving contracts with the government, the RFP winner's intervention is uncontroversial and is noted without comment. *See, e.g., Q Integrated Cos. v. United States*, 126 Fed. Cl. 124, 127, 138 (2016); *Springfield Parcel C, LLC v. United States*, 124 Fed. Cl. 163, 169 (2015); *Microdyne Outsourcing, Inc. v. United States*, 72 Fed. Cl. 230, 231 (2006).

[4] Clean Line has undertaken a variety of obligations in the Participation Agreement such as implementing the Mitigation Action Plan, and voluntary rights-of-way acquisition. Hurtado Decl. ¶ 11.

[5] Clean Line's interest at stake in this lawsuit also satisfies any requirement that intervenors must independently establish their Article III standing under Rule 24. *Nat'l Parks Conservation Ass'n*, 759 F.3d at 974-75.

*Club v. Espy*, 18 F.3d 1202, 1207 (5th Cir. 1994) ("These member companies have legally protectable property interests in existing timber contracts that are threatened by the potential bar on even-aged management.").

Clean Line has an interest in protecting the validity of DOE's review and decision on the RFP, the resulting the Participation Agreement, and the rights and obligations that Clean Line holds under this Agreement.

> **2. Clean Line Has Acquired Significant Assets and Property Rights in Furtherance of Project Implementation.**

Clean Line must also be allowed to intervene due to the threat this lawsuit poses to Clean Line's assets and property rights that it has acquired in development of the Project, as well as the substantial financial commitments it has made to implement the Project. *Mille Lacs*, 989 F.2d at 998 ("The result of the litigation also may affect the proposed intervenors' property values."); *Nat'l Parks Conservation*, 759 F.3d at 976 ("[utility's] property interests in its [power plant] and its financial stake in the litigation are sufficient to satisfy the recognized interest requirement of Rule 24(a)(2)" where suit sought to have the Environmental Protection Agency ("EPA") order additional pollution controls at the plant). Clean Line has invested over $80 million in project development activities and assets, which includes hundreds of transmission line easements, environmental studies, engineering and design work, interconnection studies and agreements, and vendor contracts to enable Clean Line to implement the Project. *See* Hurtado Decl. ¶¶ 9, 12, 13. If the Plaintiffs were to succeed in this suit, the value of those acquired real estate interests and other assets would be significantly reduced, if not eliminated entirely. *Id.* ¶¶ 13. Clean Line's interest in protecting the value of these assets and property rights warrants intervention.

**C.     Clean Line's Interests Will Be Impaired if Plaintiffs Prevail**

The third requirement for intervention under Rule 24(a) that an interest may be impaired by the litigation is easily satisfied because Plaintiffs have asked the Court to enjoin Clean Line and DOE from continuing the Project.  If Plaintiffs are successful, Clean Line will be deprived of the existing contract and property rights detailed herein and the opportunities and benefits—both financial and environmental—presented by the operation of this Project.  From a financial perspective, Clean Line will have performed environmental studies and surveys, completed advanced engineering and design, negotiated interconnection agreements, and obtained several hundred easements, among other things, that would become substantially less valuable or worthless.  Hurtado Decl. ¶¶ 9, 12, 13.  The Project's assets are not useful or valuable for purposes other than the Project. *See id.* ¶ 13.  From an environmental perspective, Clean Line's core mission is to develop needed new infrastructure to bring renewable energy to market. *Id.* ¶ 3.  When completed, the Project will provide transmission service supporting the delivery of low-cost wind energy to load centers in Arkansas, the South, and Mid-South. *Id.* ¶ 4.  These opportunities will not just be impaired if the Project does not move forward, they will be lost.

This lawsuit seeks to dissolve all of the work Clean Line has done to develop the Plains & Eastern Clean Line and to end the opportunity to engage in a public/private partnership with DOE for the sale and provision of transmission service over the Project.  Clean Line's interests will unquestionably be impaired if Plaintiffs prevail.

**D.     Clean Line's Interests Cannot Be Adequately Protected by the Existing Parties**

The final issue for the Court to consider is whether the existing parties can adequately protect the interests of the party seeking intervention.  Typically, the burden to demonstrate that the parties to the litigation will not adequately represent the intervenor's interests is minimal.

*Union Elec. Co.*, 64 F.3d at 1168; *Nat'l Parks Conservation*, 759 F.3d at 976 ("A proposed intervenor typically need only 'carry a "minimal" burden of showing that their interests are inadequately represented by the existing parties.'" (quoting *Mille Lacs*, 989 F.2d at 999). When one of the parties is a government and the case concerns a matter of sovereign interest, the government is presumed to represent the interests of all of its citizens. *Union Elec. Co.*, 64 F.3d at 1168; *S. Dakota ex rel. Barnett*, 317 F.3d at 785. An intervenor can overcome this presumption, however, by demonstrating "that [its] interest is not subsumed within the general interests of the public." *S. Dakota v. Ubbelohde*, 330 F.3d 1014, 1025 (8th Cir. 2003). "If the citizen stands to gain or lose from the litigation in a way different from the public at large, the *parens patriae* [the government] would not be expected to represent him." *Chiglo v. City of Preston*, 104 F.3d 185, 188 (8th Cir. 1997). In this case, DOE, representing the public, cannot adequately protect Clean Line's narrow, parochial interest arising from Clean Line's investments in the Project.

The U.S. Court of Appeals for the Eighth Circuit's decision in *National Parks Conservation Ass'n* weighs heavily in favor of the Court granting Clean Line's motion. *See* 759 F.3d 969. In that case, the district court denied a power plant owner's motion to intervene in an action by environmental groups challenging the EPA's decision not to initiate a rulemaking that could impose new Clean Air Act requirements on the power plant because it held that the EPA could adequately represent the power plant's interest. *Id.* at 972-73. On appeal, the Eighth Circuit reversed and stated that the power plant's interests were not adequately represented by the EPA. *Id.* at 976. The Eighth Circuit recognized that the intervenor's specific interest in the operation of its power plant without having to install costly pollution control devices was distinguishable from "the EPA's general interests in assuring that the proper regulatory procedures are followed." *Id.* at 977.

Here, Clean Line has additional, independent interests and obligations that would be affected by this litigation that the government and public do not and could not share. As detailed above, Clean Line has a variety of financial commitments and property interests to protect, which is a "more 'parochial' financial interest not shared by other citizens." *Union Elec. Co.*, 64 F.3d at 1170; *see also Mille Lacs*, 989 F.2d at 1001; *Sierra Club v. Glickman*, 82 F.3d 106, 110 (5th Cir. 1996) (financial interest alone sufficient to support intervention). Further, it is Clean Line that bears the cost of any changes to the Project, not DOE. Compl., Ex. D ¶¶ 4.1(a) & 4.4, at 50, 54 (EXH. D 000057, 61); Hurtado Decl. ¶¶ 8, 12. These are all interests specific to Clean Line and no one else.

Clean Line and DOE entered into an arms-length negotiation regarding the nature of DOE's participation in the Project. Clean Line has the right to ensure that DOE is able to perform on the Participation Agreement without imposing new costs on Clean Line. DOE, on the other hand, will represent the general interest of the public at large. *Sierra Club*, 82 F.3d at 110 (the "government must represent the broad public interest, not just the economic concerns of [one] [developer]") (quoting *Espy*, 18 F.3d at 1208). Clean Line shares DOE's interest in upholding the validity of the decision to participate in the Project under Section 1222. But if, for example, there are settlement discussions, DOE will not and should not represent Clean Line's interests. Clean Line must have an independent seat at the table to represent its unique interests. *See, e.g.*, *Mille Lacs*, 989 F.2d at 1001. Finally, as the original Project proponent and sponsor, and the primary party responsible for key project activities, such as executing commercial agreements and financing, Clean Line should be allowed to intervene to provide crucial detail as to how this litigation could ultimately impact the Project's schedule and its overall viability. Hurtado Decl. ¶ 14-16. After all, Clean Line must bear the cost of any delays or changes to the Project, not DOE. *Id.* ¶¶ 8, 12.

Clean Line has devoted years of work and expended tens of millions of dollars in developing the Project, all of which is at stake in this lawsuit.  Clean Line has a right to participate in this action as a party and defend its myriad interests in the Project.

## II.   CLEAN LINE SHOULD BE ALLOWED TO INTERVENE UNDER RULE 24(b)

Clean Line should also be permitted to intervene pursuant to Rule 24(b), which provides that "[o]n timely motion, the court may permit anyone to intervene who[] . . . has a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b).  Parties seeking permissive intervention must show:  "(1) an independent ground for jurisdiction, (2) timeliness of the motion, and (3) that the applicant's claim or defense and the main action have a question of law or fact in common." *Flynt v. Lombardi*, 782 F.3d 963, 966 (8th Cir. 2015) (internal footnote omitted).  The principal consideration in ruling on a motion for permissive intervention is "whether the proposed intervention would unduly delay or prejudice the adjudication of the parties' rights." *S. Dakota ex rel. Barnett*, 317 F.3d at 787.

### A.   Clean Line's Intervention Will Not Cause an Excessive Delay or Prejudice the Rights of the Original Parties

Permissive intervention that causes an excessive delay and may result in prejudice typically occurs after the original parties engage in extensive motion practice, set a discovery schedule, commence written discovery, and begin taking depositions. *Am. Civil Liberties Union of Minn. v. Tarek ibn Ziyad Acad.*, 643 F.3d 1088, 1094-95 (8th Cir. 2011).  As explained in Part I(A) above, Clean Line has filed this motion to intervene before the Defendants have answered, and before the Defendants have produced the Administrative Record necessary to consider this challenge.  Allowing Clean Line to intervene will not delay this lawsuit or prejudice anyone. Because this is an Administrative Procedure Act ("APA") review, the Plaintiffs' claims should be resolved on the Administrative Record.  Further, Clean Line does not anticipate requiring

14

discovery, nor does it anticipate filing any motions aside from the standard motion exchange used to resolve APA matters.

Because this action has only recently commenced, and because Clean Line does not anticipate initiating any proceedings outside of the ordinary course of an APA appeal, there will be no delay to the proceedings or prejudice to either party by allowing Clean Line to intervene.

### B.      Clean Line Has Independent Jurisdictional Grounds to Intervene

Clean Line also has independent jurisdictional grounds because this Court has jurisdiction over "all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331.  Applicants for intervention who assert a defense that raises a federal question have independent jurisdictional grounds. *See Minn. Pub. Interest Res. Grp. v. Selective Serv. Sys.*, 557 F. Supp. 923, 924-25 (D. Minn. 1983) (finding independent jurisdictional grounds where intervenors alleged a federal question).  Plaintiffs' claims arise under federal law and Clean Line's defenses to those claims are based on federal laws.  Clean Line does not anticipate asserting any counter-claims against Plaintiffs so the Federal Rules of Civil Procedure are not being used to extend or limit federal court jurisdiction, which is the primary concern against which this requirement seeks to guard.  *See Conseco v. Wells Fargo Fin. Leasing, Inc.*, 204 F. Supp. 2d 1186, 1192-93 (S.D. Iowa 2002).  This factor therefore poses no obstacle to permissive intervention.

### C.      Clean Line's Defenses Share Common Questions of Law and Fact with the Present Action

The final consideration for permissive intervention is whether common questions of law and fact exist.  This requires a nexus between the circumstances, interests, claims, or defenses of the parties and intervenors that closely correlate. *See Minn. Pub. Interest Res. Grp.*, 557 F. Supp. at 924.  In *Arkansas Nature Alliance, Inc. v. U.S. Army Corps of Engineers*, the Court looked at

this issue and concluded that when a plaintiff sought to nullify a federal permit, the permit holder's defense of that permit shared common questions of law and fact with the plaintiffs' lawsuit. No. 4:05CV00622, 2005 WL 2095701, at *2, *3 (E.D. Ark. Aug. 29, 2005).  In the instant lawsuit, the Plaintiffs seek to nullify DOE's decision to participate in the Project.  As an RFP respondent and now counterparty to the Participation Agreement, Clean Line wants to defend DOE's approval of the Project and protect its legal rights and obligations set forth in the Participation Agreement.  These efforts share common questions of law and fact with Plaintiffs' attempt to unravel that authorization.  Clean Line therefore satisfies all of the conditions for permissive intervention, and the Court should grant this motion.

## CONCLUSION

Clean Line has committed extraordinary time and resources to develop the Plains & Eastern Clean Line and secure DOE's approval and participation in the Project.  This lawsuit threatens to undo all of that and derail a $2.5 billion partnership that will bring clean energy to Arkansas and other under-served areas in the Mid-South and Southeast, which will reduce power prices, create thousands of jobs, and cut down on harmful pollution.  As the primary Project proponent and the party with financial responsibility, it would be unfair and inefficient to exclude Clean Line from these proceedings.  Clean Line respectfully requests that this Court grant this motion to intervene so that Plains and Eastern Clean Line Holdings LLC can participate in these proceedings as a party.

QUATTLEBAUM, GROOMS
  & TULL PLLC
111 Center Street, Suite 1900
Little Rock, AR  72201
Phone:          (501) 379-1700
Facsimile:     (501) 379-1701
Email:          mheister@qgtlaw.com

By: _____
      Steven W. Quattlebaum, Ark. Bar #84127
      John E. Tull, III, Ark. Bar #84150
      Michael B. Heister, Ark. Bar #2002091

      *Attorneys for Plains and Eastern Clean Line
      Holdings LLC*

17

## CERTIFICATE OF SERVICE

I hereby certify that, on the 12th day of October, 2016, I filed the foregoing with the Clerk of Court and shall serve this filing via email and first-class mail to all counsel of record:

Jordan P. Wimpy
Christopher L. Travis
GILL RAGON OWEN, P.A.
425 West Capitol Avenue, Suite 3800
Little Rock, Arkansas 72201
(501) 376-3800 – Telephone
(501) 376-4286 – Facsimile
jwimpy@gill-law.com

James J. DuBois
U.S. Department of Justice
Environment and Natural Resources Division
999 18th Street
South Terrace, Suite 370
Denver, CO 80202
(303) 844-1375 – Telephone
(303) 844-1350 – Facsimile
james.dubois@usdoj.gov

Stephen Finn
U.S. Department of Justice
Environment and Natural Resources Division
P.O. Box 7611
Washington, D.C. 20044
(202) 305-3284 – Telephone
(202) 353-0506 - Facsimile
Stephen.finn@usdoj.gov

Reade E. Wilson
U.S. Department of Justice
Environment and Natural Resources Division
P.O. Box 7611
Washington, D.C. 20044
(202) 305-0299 – Telephone
reade.wilson@usdoj.gov

Michael B. Heister