IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
JONESBORO DIVISION

DOWNWIND LLC and GOLDEN
BRIDGE LLC                                           PLAINTIFFS

v.                    No. 3:16-cv-207-DPM

UNITED STATES DEPARTMENT
OF ENERGY; RICK PERRY, in his
official capacity as Secretary of the
United States Department of Energy;
SOUTHWESTERN POWER ADMINISTRATION;
and SCOTT CARPENTER, in his official
capacity as Administrator of the
Southwestern Power Administration                    DEFENDANTS

PLAINS & EASTERN CLEAN
LINE HOLDINGS LLC                                    INTERVENOR

ORDER

**1. Summary.** A dozen years ago, Congress passed and the President signed the Energy Policy Act of 2005. Public Law 109-58. If you've gotten a rebate for replacing your hot water heater with a more efficient one, or gotten a tax credit for buying a hybrid vehicle, it was thanks to this law. 42 U.S.C. § 15821; 26 U.S.C. § 30B. The statute also addressed electricity and, in particular, modernizing our nation's infrastructure for transmitting electricity—the grid. One provision authorized the United States to use someone else's money to upgrade

or expand the grid. 119 Stat. 952, codified at 42 U.S.C. § 16421.* A proposed new transmission line prompts this case. It pits some affected landowners against a group of investors and the United States.

---

* Here's this part of the statute:
    **Third-party finance**
    **(a) Existing facilities**
    The Secretary, acting through the Administrator of the Western Area Power Administration (hereinafter in this section referred to as "WAPA"), or through the Administrator of the Southwestern Power Administration (hereinafter in this section referred to as "SWPA"), or both, may design, develop, construct, operate, maintain, or own, or participate with other entities in designing, developing, constructing, operating, maintaining, or owning, an electric power transmission facility and related facilities ("Project") needed to upgrade existing transmission facilities owned by SWPA or WAPA if the Secretary, in consultation with the applicable Administrator, determines that the proposed Project—
    (1) **(A)** is located in a national interest electric transmission corridor designated under section 216(a) of the Federal Power Act [16 U.S.C. 824p(a)] and will reduce congestion of electric transmission in interstate commerce; or
    **(B)** is necessary to accommodate an actual or projected increase in demand for electric transmission capacity;
    (2) is consistent with—
    **(A)** transmission needs identified, in a transmission expansion plan or otherwise, by the appropriate Transmission Organization (as defined in the Federal Power Act) [16 U.S.C. 791a et seq.]), if any, or approved regional reliability organization; and
    **(B)** efficient and reliable operation of the transmission grid; and
    (3) would be operated in conformance with prudent utility practice.
    **(b) New facilities**
    The Secretary, acting through WAPA or SWPA, or both, may design, develop, construct, operate, maintain, or own, or participate with other entities in designing, developing, constructing, operating, maintaining, or owning, a new electric power transmission facility and related facilities ("Project") located within any State in which WAPA or SWPA operates if the Secretary, in consultation with the applicable Administrator, determines that the proposed Project—
    (1) **(A)** is located in an area designated under section 216(a) of the Federal Power Act [16 U.S.C. 824p(a)] and will reduce congestion of electric transmission in interstate commerce; or
    **(B)** is necessary to accommodate an actual or projected increase in demand for electric transmission capacity;
    (2) is consistent with—
    **(A)** transmission needs identified, in a transmission expansion plan or otherwise, by the appropriate Transmission Organization (as defined in the Federal Power Act [16 U.S.C. 791a et seq.]) if any, or approved regional reliability organization; and
    **(B)** efficient and reliable operation of the transmission grid;
    (3) will be operated in conformance with prudent utility practice;

The Clean Line entities propose to build a high-voltage direct-current transmission line to bring wind power east from the Oklahoma and Texas panhandles. The line would be approximately seven hundred miles long. Some of the electricity would be available in Oklahoma and Arkansas. This would happen through converter

---

    (4)    will be operated by, or in conformance with the rules of, the appropriate (A) Transmission Organization, if any, or (B) if such an organization does not exist, regional reliability organization; and

    (5)    will not duplicate the functions of existing transmission facilities or proposed facilities which are the subject of ongoing or approved siting and related permitting proceedings.

(c) **Other funds**

    (1) **In general**
    In carrying out a Project under subsection (a) or (b) of this section, the Secretary may accept and use funds contributed by another entity for the purpose of carrying out the Project.

    (2) **Availability**
    The contributed funds shall be available for expenditure for the purpose of carrying out the Project—
        **(A)** without fiscal year limitation; and
        **(B)** as if the funds had been appropriated specifically for that Project.

    (3) **Allocation of costs**
    In carrying out a Project under subsection (a) or (b) of this section, any costs of the Project not paid for by contributions from another entity shall be collected through rates charged to customers using the new transmission capability provided by the Project and allocated equitably among these project beneficiaries using the new transmission capability.

(d) **Relationship to other laws**
Nothing in this section affects any requirement of—
    (1)    any Federal environmental law, including the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.);
    (2)    any Federal or State law relating to the siting of energy facilities; or
    (3)    any existing authorizing statutes.

(e) **Savings clause**
Nothing in this section shall constrain or restrict an Administrator in the utilization of other authority delegated to the Administrator of WAPA or SWPA.

(f) **Secretarial determinations**
Any determination made pursuant to subsections (a) or (b) of this section shall be based on findings by the Secretary using the best available data.

(g) **Maximum funding amount**
The Secretary shall not accept and use more than $100,000,000 under subsection (c)(1) of this section for the period encompassing fiscal years 2006 through 2015.

stations, which would change the current from direct to alternating. Most of the electricity, though, would flow through to a converter station in Tennessee. The dotted line on this map, DOE0063121, shows the proposal.



After six years of study—including public notice and public comment, but no adversary proceedings—the Department of Energy decided to participate. Oklahoma and Tennessee, through their respective regulatory bodies, have approved the project. Arkansas has not. Early on, Clean Line sought approval from the Arkansas Public Service Commission, which denied the request without prejudice.

- 4 -

DOE0024855A-0001 to 0012. At that point, the proposal didn't include an Arkansas converter station, and all the power was just passing through. The APSC concluded that, in those circumstances, Clean Line wasn't a public utility under Arkansas law. The project evolved. Now there's a converter station planned in Pope County. Although Clean Line will pay for building everything, the United States will own all the facilities in Arkansas and get a small share of the profits from the entire line's capacity. DOE0000183. The plan is for Clean Line to enter into agreements with the Southwest Power Pool, the Midcontinent Independent System Operator, and the Tennessee Valley Authority to coordinate the line's operation. Clean Line, though, will operate and maintain all related facilities. In return for doing all this, Clean Line will own most of the line's capacity and reap what it hopes will be a profit on an approximately $2.5 billion investment.

Two groups of Arkansas landowners—Downwind and Golden Bridge—filed this case to stop the project. (From now on, when the Court writes Downwind it means both groups.) These landowners make several claims. They say the United States has overreached its statutory authority in two ways: the Arkansas Public Service Commission hasn't approved the project, and it must; plus the statute doesn't authorize the United States to take property for the line by condemnation if a landowner doesn't agree to sell an easement. Next, the landowners say the Department acted arbitrarily and capriciously

in deciding to participate in this project. Last, the landowners contend they were due more process—a hearing with trial-like procedures, what would have occurred before the APSC if a state-approved utility had proposed the line. The practical thrust of the landowners' case is that this project is mostly about Clean Line making money and very little about the United States improving the grid. The Court allowed Clean Line to intervene and be heard. The parties agree that one side or the other is entitled to judgment as a matter of law.

**2. Statutory Authority.** The United States didn't act beyond its statutory power in approving this project. In the circumstances presented, Arkansas doesn't get to decide where the transmission line is located. And the State doesn't have a veto over whether this line gets built.

Section 1222 authorizes the Department of Energy to build transmission lines with private money. In doing so, it's the Department's responsibility to identify grid needs, develop responsive projects, and decide where to improve existing lines and put new ones. 42 U.S.C. § 16421(a) & (b). That's what happened here. The Department identified a grid shortcoming and, through a deliberative process, designed a new power line to address it. Clean Line's dollars will pay for the line. DOE0000176–84; DOE0000221–30. Nonetheless, as § 1222 contemplates, the project is the United States' sovereign action. The Energy Policy Act envisions and authorizes this way of

modernizing our electrical grid. Third-party financing is what § 1222 is all about.

When the United States acts pursuant to its constitutional powers, a state may not block the action unless Congress has clearly and unambiguously authorized plenary state regulation. *Hancock v. Train*, 426 U.S. 167, 178–79 (1976). The Supremacy Clause requires nothing less. *M'Culloch v. Maryland*, 17 U.S. 316, 426–27 (1819). These principles are common ground among all the parties. Downwind contends, though, that § 1222 requires the Department to get state regulatory approval to build this new line. That requirement would give Arkansas a *de facto* veto over whether this transmission line gets built. But there is no waiver of federal supremacy here. This statute doesn't make unambiguously clear that the federal government, which is usually exempt from state control, is subject to that control when building electrical lines paid for by third parties.

Downwind argues that § 1222(d)'s "[r]elationship to other laws" provision contains the needed waiver. The statute says that "[n]othing in this section affects any requirement of . . . any Federal or State law relating to the siting of energy facilities[.]" Downwind underlines the repeated "any." It shows, the landowners continue, Congress' intention to give state regulators the last word on siting, the definitive say which states have long had for most transmission lines. But that word isn't enough. State control doesn't arise by implication. *Hancock*,

426 U.S. at 180-81. And the Court of Appeals has concluded, in strikingly similar circumstances, that even specific language "requir[ing] compliance with [s]tate standards" doesn't mean the Department must "obtain a state siting certificate" for a new line. *Citizens & Landowners Against the Miles City/New Underwood Powerline v. Secretary, United States Department of Energy*, 683 F.2d 1171, 1179 (8th Cir. 1982). Just as South Dakota regulators did not have the final say over the route of the federal transmission line between Miles City, Montana and New Underwood, South Dakota, Arkansas regulators do not have that power over this line.

Plus, there's a better reading of § 1222(d). It preserves the regulatory status quo. The Energy Policy Act doesn't disturb current law; the Department can't preempt—and energy actors can't ignore—the many existing state regulations about transmission lines and facilities. Nowhere in the status quo, however, is federal action about those lines and facilities subject to state approval. *Miles City*, 683 F.2d at 1181. Section 1222 doesn't change that. In fact, the statute makes clear, by authorizing the Department to build interstate transmission lines with the help of non-federal funding, that the federal government can take on a larger role in electrical transmission.

**3. Condemnation.** Whether the Energy Policy Act authorizes the United States to acquire needed easements by condemnation is a vexed question. There's a tension in the government's arguments here. On

the one hand, to forestall a decision on the deep issue, the government deploys just about every justiciability doctrine known to our law—standing, exhaustion, ripeness. The Department argues several points hard: the landowners haven't really been injured yet; it's uncertain whether any property will actually be condemned; and the landowners can assert the United States' lack of statutory authority to condemn later in any condemnation action that may occur. On the other hand, the government says the power to condemn is essential to this project, necessarily implied in § 1222's grant of authority to develop and own transmission lines and facilities.

Notwithstanding the tension between these arguments, the government's embedded concern about an advisory opinion is solid. This Court may not decide a dispute that isn't ripe. An available alternative remedy usually signals a premature claim. This is true in general, *National Park Hospitality Association v. Department of the Interior*, 538 U.S. 803, 807–08 (2003), and for an Administrative Procedure Act claim in particular. 5 U.S.C. § 704. Here, there is an alternative remedy. Any landowner who doesn't convey an easement will have the opportunity to contest any resulting condemnation. *United States v. Herring*, 750 F.2d 669, 674 (8th Cir. 1984). The landowner will be free to argue then against statutory authorization, public necessity, and public use. *Ibid.* That opportunity makes any decision about condemnation now advisory. The parties' cases make this point from another

direction. Every one of these precedents is a condemnation action. *E.g.*, *Albert Hanson Lumber Company v. United States*, 261 U.S. 581 (1923); *Barnidge v. United States*, 101 F.2d 295 (8th Cir. 1939); *Polson Logging Company v. United States*, 160 F.2d 712 (9th Cir. 1947); *United States v. 14.02 Acres of Land More or Less in Fresno County*, 547 F.3d 943 (9th Cir. 2008). The landowners will have their day in court on these issues if and when the injury—having their property taken—has actually occurred.

Neither Downwind's reliance on the Supreme Court's recent *Hawkes* decision nor its eloquent invocation of all the uncertainties now facing the landowners changes the analysis. The Department's decision to participate in the Clean Line project lacks the jurisdictional immediacy of the "your property is a wetland" determination in *United States Army Corps of Engineers v. Hawkes Company*, 136 S. Ct. 1807 (2016). That determination affected a particular landowner's legal rights instantly; it changed the applicable law. 136 S. Ct. at 1811–13. Here, the Department's decision raises the prospect of eminent domain later. This surely casts a shadow. As frustrating as that shadow is, uncertainty isn't injury-in-fact. *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 180–81 (2000). The law requires concrete injury, actual or imminent. *Ibid.* While the landowners have a strong imminence argument that condemnation of some parcels in the several-hundred-mile path across Arkansas is a

near certainty, it's unclear at this point exactly which parcel or parcels might be taken. As far as the Court can see, for example, no Downwind or Golden Bridge member has filed an "I'll never sell" affidavit. № 63-1; № 73-1; № 73-2. And it is clear, on the other hand, that any landowner who wants to challenge the United States' statutory authority to condemn property for this particular transmission line can do so later.

**4. Administrative Procedures.** The Department of Energy acted reasonably and carefully, not arbitrarily and capriciously, in deciding to participate in this project. The law asks "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Manufacturers Association of the United States, Inc. v. State Farm Mutual Automobile Insurance Company*, 463 U.S. 29, 43 (1983); *see also Lion Oil Company v. Environmental Protection Agency*, 792 F.3d 978, 982 (8th Cir. 2015). The Department didn't fall foul along any of these lines.

**Statutory Criteria.** Congress prescribed five criteria for evaluating § 1222 projects.

- Necessity — the project must be needed to accommodate actual or projected demand for electric transmission capacity;

- Consistency — the project must be consistent with transmission needs identified by an appropriate entity, as well as with efficient and reliable grid operation;

- Conformity — the project must be operated using prudent utility practices;

- Operation — the project must be operated by the appropriate transmission entity; and

- No duplication — the project cannot duplicate existing or proposed transmission facilities.

42 U.S.C. § 16421(b). The landowners accept the Department's judgment that this line satisfies the conformity, operation, and no-duplication criteria. They challenge the Department's call on one part of necessity (will anybody in Arkansas or Tennessee need this electricity?) and one part of consistency (did the Department select the correct transmission organization?).

First, necessity. Section 1222 required the Department of Energy to decide whether the project is "necessary to accommodate an actual or projected increase in demand for electric transmission capacity[.]" 42 U.S.C. § 16421(b)(1)(B). It's undisputed that this project is already oversubscribed by wind-power generators. DOE0000035. The landowners say the Department focused too much on Oklahoma generators' demand for transmission lines, without considering whether anybody in Arkansas or Tennessee actually needs more

power. The statute, though, is silent about scrutinizing where the electricity will go; it defines necessity only in terms of "demand for electric transmission *capacity*[.]" 42 U.S.C. § 16421(b)(1)(B) (emphasis added). Of course demand for the power is also important. A transmission line that was like a bridge to nowhere would be unreasonable. And, contrary to the landowners' argument, the Department did consider consumer demand. It relied on interregional studies predicting a growing need for west-to-east electricity transmission. DOE0002391-2509; DOE0006231-6377; DOE0025075-25303. While the landowners criticize those studies, their particulars and how to weigh them are matters within the Department's expertise. The United States' focus on the statute's priority—projected demand for transmission capacity—wasn't arbitrary. *Motor Vehicle Manufacturers*, 463 U.S. at 43.

Second, the appropriate transmission entity. Section 1222 also required the Department to make sure that this project was "consistent with ... transmission needs identified, in a transmission expansion plan or otherwise, by the appropriate Transmission Organization (as defined in the Federal Power Act [16 U.S.C. 791a et seq.]) if any, or approved regional reliability organization[.]" 42 U.S.C. § 16421(b)(2)(A). "Transmission Organization" is defined at 16 U.S.C. § 796(29). The Department chose the Southwest Power Pool as the appropriate entity. The wind, and most of this transmission line, are

within the Southwest Power Pool's footprint, which covers Oklahoma and western Arkansas. DOE0000037. So the Department's choice makes good sense. The landowners agree that the Southwest Power Pool is an appropriate transmission organization, but they press that so is the Midcontinent Independent System Operator. The project connects with this second system's transmission facilities and the Pope County, Arkansas converter station is in its footprint. The statute, however, doesn't allow designation of more than one transmission organization as the leader in identifying needs. The Department's choice of the Southwest Power Pool as "the appropriate" organization wasn't capricious. It was a reasoned pick between alternatives.

The landowners' deeper point is that the Midcontinent Independent System Operator's views and needs should have been considered more carefully. The record here is against Downwind. The Midcontinent Independent System Operator participated in the interregional studies about the need for west-to-east transmission capacity. And the Department—through Clean Line and other experts—consulted that other organization about congestion and the planned Arkansas interconnection. DOE0025075-25303; DOE0002391-2509; DOE0005975-6134. Overall, as it should have, the Department adequately considered how this project would affect the Midcontinent Independent System Operator. *Motor Vehicle Manufacturers*, 463 U.S. at 43.

**Extra-Statutory Factors.** When the Department opened the floor for § 1222 projects, it gave notice that it would consider several factors in deciding whether to participate in any project that satisfied all the statutory criteria. 75 Fed. Reg. § 32940 (10 June 2010). The statute says that the Department "may" participate in eligible projects, not that it must do so. 42 U.S.C. § 16421(b). The parties agree that, in these circumstances, a checklist beyond the statute was fine. *Compare Whitman v. American Trucking Associations, Inc.*, 531 U.S. 457, 465–71 (2001), *with Immigration & Naturalization Service v. Yueh-Shaio Yang*, 519 U.S. 26, 29–30 (1996). Here's the Department's checklist:

- Whether the project is in the public interest;
- Whether the project will facilitate the reliable delivery of renewable energy;
- The benefits and impacts of the transmission line on each state it traverses, including environmental and economic impacts; and
- The technical and financial viability of the project.

DOE0000011.

The landowners challenge only the Department's focus on renewable energy. They say Congress didn't intend for § 1222 to promote renewable energy, and that the Department disproportionately favored that factor. There's no evidence of either. The record shows that the project's engineering and financing drove much of the government's deliberations, probably moreso than

- 15 -

delivering renewable energy. DOE0000070-76. And nothing in § 1222 suggests that Congress didn't want the Department to use that provision to promote new energy resources. On the contrary, § 1222 aims to upgrade existing transmission facilities and build new ones without duplicating current or planned facilities. 42 U.S.C. § 16421(a) & (b)(5). The Energy Policy Act devoted an entire title to renewable energy. The Department's extra-statutory criteria didn't undermine Congress' goals. They helped accomplish them.

**Best Available Data.** The statute required the Department to use the "best available data" in evaluating Clean Line's proposal. 42 U.S.C. § 16421(f). It did. This administrative record is 95,060 pages long. The landowners point to three interregional studies that projected a growing need for new west-to-east transmission capabilities. DOE0002391-2509; DOE0006231-6377; DOE0025075-25303. They say these studies are unreliable because they're partly based on assumptions about future economic and environmental regulations that favor renewable energy sources. Predicting the future is an inherently uncertain business. Section 1222 doesn't require perfect data. And these studies are thorough and rigorous, though of course imperfect in hindsight. Who knows, for example, what the ultimate fate of the Clean Power Plan will be. The Department moved forward with the best data it had at the time. Given the agency's expertise, this

Court owes its decision deference. *United States v. Mead Corporation*, 533 U.S. 218, 234–35 (2001).

**5. Due Process.** The United States hasn't deprived the landowners of due process. There's no question that this project casts a shadow on their land. But this happens whenever a state plans a highway or a city starts annexing territory. *Chacon v. Granata*, 515 F.2d 922, 924–25 (5th Cir. 1975). The Court must focus on the affected property interests. *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976). The landowners say their peaceful use and free enjoyment of their property is under attack. Folks from Clean Line are knocking on doors and asking to buy easements. But those visits don't prevent landowners from using and enjoying their property, albeit with some uncertainty. The landowners retain the right to exclude. Some have allowed Clean Line in to appraise the land. Others have not. *Compare* № 73-1 *at 3, with* № 73-2 *at 3*. The landowners who've not allowed Clean Line on their premises say they're at risk of low appraisals, but there's no record evidence of that danger.

There's been much process about this proposed transmission line. Procedural requirements for informal agency action are minimal. The law doesn't require courtroom-like procedures. Adequate notice was published. The Department held fifteen public hearings in Oklahoma, Texas, Arkansas, and Tennessee. DOE0000015–16. It received more than seven hundred comments, including some from Downwind

members. DOE0000016. The Department considered those comments. And while it is too much to hope that everyone will agree with this Court's decision, perhaps everyone will acknowledge that they have been fully heard here. If there are condemnation actions, this Court or another one will see that the law is followed in those circumstances. In sum, notwithstanding the shadow necessarily created by any public work like this project, the landowners have not been deprived of due process.

\* \* \*

The federal defendants' and intervenor Clean Line's cross motions for judgment, № 66 & № 69, are granted. Downwind's motion, № 63, is denied. The amended complaint's condemnation-related claims, counts three and five, *№ 20 at 29–30 & 36–40*, will be dismissed without prejudice; all other claims will be dismissed with prejudice.

So Ordered.

*[signature]*
D.P. Marshall Jr.
United States District Judge

21 December 2017